# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA and
THE STATE OF FLORIDA,
*ex rel.* Larry Bomar,

        Plaintiffs,

vs.

BAYFRONT HMA MEDICAL CENTER, LLC,
JOHNS HOPKINS ALL CHILDREN'S HOSPITAL, INC.,
MORTON PLANT HOSPITAL ASSOCIATION, INC.,
TRUSTEES OF MEASE HOSPITAL, INC.,
ST. ANTHONY'S HOSPITAL, INC., and
COMMUNITY HEALTH CENTERS OF PINELLAS, INC.

        Defendants.

_____/

Case No. 8:16cv 3310 T17 JSS

**FILED *IN CAMERA* UNDER SEAL -
pursuant to 31 U.S.C. §3730(b)(2).**

**JURY TRIAL DEMANDED**

## PLAINTIFF-RELATOR LARRY BOMAR'S COMPLAINT UNDER
## THE FALSE CLAIMS ACT

        Plaintiff-Relator, Larry Bomar ("Mr. Bomar") by and through undersigned counsel, pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and on behalf of himself and plaintiff United States of America, hereby sets forth, based upon personal knowledge and relevant documents, the following Complaint against defendants, Bayfront HMA Medical Center, LLC, Johns Hopkins All Children's Hospital, Inc., Morton Plant Hospital Association, Inc., Trustees of Mease Hospital, Inc., St. Anthony's Hospital Inc., and Community Health Centers of Pinellas, Inc., and alleges as follows:

### I.      NATURE OF THE ACTION

        1.      This is an action to recover damages and civil penalties on behalf of the United States arising out of false and/or fraudulent records, statements and claims presented or made and used, or caused to be made and used by the defendants in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").

1

2.     The FCA imposes liability for a civil penalty of up to $11,000 per claim, plus treble damages, upon any person who: knowingly presents or causes the submission to the United States of a false claim; knowingly makes or causes to be made a false statement or record related to the submission to the United States of a false claim; knowingly conceals or avoids an obligation to pay the United States; or conspires to violate any of the FCA's substantive provisions. *See* 32 U.S.C. § 3729(a)(1)(A), (B), (C), & (G).

3.     Liability under the FCA attaches when a defendant knowingly seeks payment, or causes to seek payment, from the government that the government would not reimburse if it knew of the violation. *Id.* § 3729(a)(1). The requisite "knowledge" can include not only actual knowledge as to the impropriety of the claim but also acts taken in deliberate ignorance of the truth or falsity of such information and acts taken in reckless disregard of the truth or falsity of the information.

4.     The FCA permits any person who has information about an FCA violation to bring an action under the FCA on behalf of himself and the United States Government, and to share in any resulting recovery, as well as to recover reasonable costs, expenses and attorney's fees from the defendant if the action is successful. *See Id.* § 3730.

5.     The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join suit. *See Id.* §§ 3730(b)(2), (3).

6.     Additionally, the FCA prohibits employers from discriminating, in any manner affecting the terms and condition of employment, against employees because of lawful acts done in furtherance of an actual or potential FCA lawsuit. *See Id.* §§ 3730(d).

7.     Based on the foregoing and as set forth fully below, Plaintiff-Relator Mr. Bomar hereby seeks to recover, on behalf of the United States, damages and civil penalties arising out of defendants presenting false or fraudulent statements or claims, causing the making or using of false

or fraudulent statement or claims, and conspiring to commit these violations of the FCA, as it relates to the defendants' scheme to obtain over $52 million in illicit Medicaid reimbursement through non-bona-fide donations to a local government entity.

## II.    THE PARTIES

8.      Mr. Bomar, *qui tam* relator, is a citizen of the United States and resides in Seminole, Florida in the Middle District of Florida. Mr. Bomar was employed as the Reimbursement Manager by the corporate predecessor to Bayfront from April of 2001 to March 31, 2013, and by defendant Bayfront from April 1, 2013, through September 30, 2016. As a result, Mr. Bomar has personal knowledge of, and experience with, various types of illegal actions and activities by the defendant Bayfront and the other defendants as outlined in detail in the following paragraphs of this Complaint.

9.      Bayfront HMA Medical Center, LLC ("Bayfront") is a Florida corporation with its principle place of business at 701 6th Street South, St. Petersburg, Florida, that operates a hospital known as Bayfront Health St. Petersburg in the Middle District of Florida.

10.     Johns Hopkins All Children's Hospital, Inc. ("All Children's") is a Florida corporation with its principle place of business at 501 6th Ave South, St. Petersburg, Florida, that operates a hospital known as All Children's Hospital in the Middle District of Florida.

11.     Morton Plant Hospital Association, Inc. ("Morton") is a Florida corporation with its principle place of business at 300 Pinellas St., Clearwater, Florida, that operates a hospital known as Morton Plant Hospital in the Middle District of Florida.

12.     Trustees of Mease Hospital, Inc. ("Mease") is a Florida corporation with is principle places of business at 3231 N. McMullen Booth Rd., Clearwater, Florida, and 601 Main Street, Dunedin, Florida, that operates hospitals known as Mease Countryside Hospital and Mease Dunedin Hospital in the Middle District of Florida.

3

13.     St. Anthony's Hospital, Inc. ("St. Anthony's") is a Florida Corporation with its principle place of business at 1200 7th Ave., St. Petersburg, Florida, that operates a hospital known as St. Antohony's Hospital in the Middle District of Florida.

14.     Community Health Centers of Pinellas, Inc. ("Community") is a Florida corporation with is principle place of business at 1344 22d St. South, St. Petersburg, Florida, that operates federally qualified health clinics in the Middle District of Florida.

### III.   JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367(a), as well as, 31 U.S.C. § 3732, which specifically vests this Court with subject matter jurisdiction over actions pursuant to 31 U.S.C. §§ 3729 and 3730.

16.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because under this section nationwide service of process is proper, the acts committed by the defendants in violation of the FCA occurred in the Middle District of Florida, and one or more of the defendants can be found, reside, and/or transact business in the Middle District of Florida.

17.     Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because one or more of the defendants can be found in and transacts business in this District and because a substantial part of the events giving rise to the claims alleged in this action occurred in this District.

18.     Consistent with 31 U.S.C. § 3730(e), there has been no public disclosure of the material allegations or transactions described in this Complaint, and the allegations set forth and transactions described herein are based upon the independent knowledge and belief of Plaintiff-Relator Mr. Bomar, who qualifies as an "original source" for purposes of 31 U.S.C § 3730(e)(4).

19.     At the time of filing this Complaint, Mr. Bomar will concurrently serve upon the Attorney General of the United States and the United States Attorney for the Middle District of

Florida a copy of this Complaint and a statement summarizing known material evidence and information related thereto, in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

## IV.    APPLICABLE LAW

### A.    The False Claims Act

20.    The False Claims Act provides that any person who knowingly presents or causes to be presented to the United States any false or fraudulent claim for reimbursement is liable to the United States for a civil penalty of between $5,500 and $11,000 for each such claim, plus triple the damages sustained by the United States as a result of such false claims. 31 U.S.C. § 3729(a)(l)(A).

21.    In addition, any person who knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim shall be liable to the United States for the same penalties. *Id.* § 3729(a)(l)(B).

22.    The FCA further imposes liability upon any person who, with respect to an obligation to pay or reimburse the government, knowingly: (1) "makes, uses, or causes to be made or used, a false record or statement material to;" (2) "knowingly conceals;" or (3) "knowingly and improperly avoids or decreases" such obligation. *Id.* § 3729(a)(l)(G).

23.    An FCA violation is "knowing" if the defendant "(i) has actual knowledge . . . ; (ii) acts in deliberate ignorance of the truth or falsity . . .; or (iii) acts in reckless disregard of the truth or falsity" of the violation. *Id.* § 3729(b)(l).

24.    A defendant need not act with the "specific intent to defraud" in order to knowingly violate the FCA. *Id.* § 3729(a)(l)(B).

25.    A person who conspires to violate the substantive FCA provisions described above is also liable under the FCA. *Id.* § 3729(a)(l)(C).

26.    Certain persons who know of a false or fraudulent claim against the United States may bring an action on behalf of himself and the United States, and share in any recovery obtained,

under Section 3729 of the FCA. *Id.* § 3730.

27.     Florida's Medicaid equivalent to the FCA similarly prohibits presenting and causing to be presented false claims, making or causing to be made false records material to a false claim, and conspiring to do either. *See* Fla. Stat. §§ 68.082(2)(a)(knowingly presents or causes to be presented a false claim), (2)(b)(knowingly makes or causes to be made or used a false record material to a false claim), (2)(c)(conspiracy).

**B.     Medicaid Program Background**

28.     Title XIX of the Social Security Act (the "Medicaid Act") authorizes federal grants to the states for their Medicaid programs to provide medical assistance to persons with limited income and resources. Medicaid programs are administered by the states in accordance with federal regulations. State Medicaid agencies conduct their programs according to a Medicaid state plan approved by the Center for Medicare & Medicaid Services ("CMS"). To carry out the mandates of the Medicaid program, the state agency pays providers for medical care and services provided to eligible Medicaid recipients. Providers that wish to participate in the Medicaid program must agree to comply with certain requirements specified in a provider agreement.

29.     While Medicaid programs are administered by the states, they are jointly financed by the federal and state governments. The federal government pays its share of medical assistance expenditures to the state on a quarterly basis according to statements of expenditures submitted by the state and a formula described in sections 1903 and 1905(b) of the Medicaid Act. The amount of the federal share of medical assistance expenditures is called the Federal Financial Participation ("FFP"). The state pays its share of medical assistance expenditures from state and local government funds in accordance with section 1902(a)(2) of the Medicaid Act.

30.     Different levels of federal funding are provided to different states depending on the individual state's need. The minimum federal matching rate share is 50% of total program costs.

1. **State Funding Abuses: Non-Bona Fide Provider Donations, Upper Payment Limits and Intergovernmental Transfers**

31.     There has been a history of past abuses that have undermined the proper balance in Medicaid financing actually provided by the state and federal governments. Since 1991, federal Medicaid regulations have excluded from the FFP state medical assistance expenditures for which the states' and/or its local government entities' share of Medicaid costs are obtained from pass-through provider donations or revenues generated by certain health-care-specific taxes. The rules governing this provision also include provisions that establish limits on the aggregate amount of payments a state may make to Disproportionate Share Hospitals ("DSH") for which FFP is available.

32.     Under section 1903(w) of the Medicaid Act, a reduction in FFP will occur if a state receives donations made by, or on behalf of, health care providers unless the donations are "bona fide" donations or meet out-stationed eligibility worker donation requirements. The law also specifies the types of health care related taxes a state is permitted to receive without a reduction in FFP.

33.     "Donations" from health care providers to state or local governments that are made with the express or implied understanding that such funds will be used for the purpose of fulfilling state matching fund obligations to the Medicaid program for the benefit of the "donating" provider do not meet the definition of "bona fide" donations that are exempt from reductions in FFP. *See* 42 C.F.R. § 433.54. The result of such arrangements is that there is no true state funded match of federal funds used to pay such Medicaid expenditures. Rather, there is only a hold harmless "donation" of funds by the provider hospital itself, which is ultimately returned to the hospital – along with additional "matching" funds from the federal government – within the year of the so-called "donation."

34.     A hold harmless situation exists, therefore, if there is a positive correlation between

7

the agreement and the Medicaid payments, Medicaid payments are conditioned upon the receipt of a donation from a private entity, or if there is a guarantee that the private entity will see a return of some, or all of that donation through a Medicaid payment.

35.     Under such improper arrangements, providers make it possible for state or local government officials to substantially increase federal Medicaid payments to providers at no actual cost to state or local governments. Such arrangements undermine the safe-guards Congress designed into the Medicaid program to condition certain categories of federal Medicaid spending (up to established overall limits) on the willingness of state and local governments to bear a defined, fair portion of the extra costs in exchange for the additional benefits such payments provide Medicaid participants within their jurisdiction.

36.     If CMS is aware of these improper arrangements, CMS will not approve State Plan Amendments ("SPAs") that include non-bona fide donations as a portion, or all, of the non-federal share of the Medicaid payments because Federal Medicaid payments must be reduced by the sum total of non-bona fide provider-related donations received by the State.

37.     Another area of state funding abuse that Congress and CMS explicitly have sought to curb in recent years is the misuse of the Medicaid Upper Payment Limit ("UPL") and Intergovernmental Transfers ("IGTs"). Effective March 19, 2002, for example, a final rule went into effect that lowered the UPL for non-state government owned or operated hospitals from 150 percent to 100 percent. This change was made in substantial part because of the federal government's discovery of the misuse of IGTs to divert much of the supplemental Medicaid payments that were previously justified as being needed for the specific benefit of such public hospitals for use by the States for other purposes – which left the government owned or operated hospitals with only a fraction of the supplemental payments and caused funding of such payments to be paid in actual effect 100% by the federal government. *Federal Register*, 67, no. 13:2602-11

(January 18, 2002).

38.     States are required by CMS to submit UPL calculations to demonstrate that payments to Medicaid providers are economical and efficient and that both base and supplemental payments are within the UPL. States are permitted to pay classes of providers up to the specified aggregate UPL for that class and CMS reviews the reasonableness of fee-for-service payment rates to help ensure that payments are efficient and economical. However, payments that exceed the UPL limit are considered out of compliance with the Federal statute and regulations.

39.     In the context of the Medicaid program, some public-private arrangements (a relationship between a private entity and a government entity in which the private entity agrees to provide a service or some other in-kind transfer of value to further the purposes of the government entity) also include provisions that the government will make an IGT to the Medicaid agency, and the private providers that have signed the agreement then become eligible for a Medicaid supplemental payment or special add-on to the base payment rate that may be funded by the IGT from the government entity under the same arrangement.

40.     This type of arrangement would not be considered a bona fide donation under Medicaid requirements regardless of the expressed intent of the providers and the governmental agencies; because, when there is an effective return of some, or all, of the donation to the private provider through Medicaid supplemental payments, a hold harmless situation exists. More specifically, any arrangement that obligates a private hospital to either assume the programmatic responsibility of a unit of government or sign lease agreements at an amount that is greater than fair market value would be considered a hold harmless situation.

41.     Any donation that is tied in any way, directly or indirectly, to Medicaid reimbursements under the Medicaid State plan would therefore not be considered bona fide.

42.     While the new regulations continued to permit states to provide special supplemental

benefits to non-state government owned or operated hospitals, based on their purported special needs and roles in serving the Medicaid populations, CMS concluded that the abuses that had become apparent demonstrated that the need was less than previously thought and that there was a need to restore greater equity among hospital providers and access provider types.

### 2. Florida's Managed Medical Assistance Program Background

43. Section 1115 of the Medicaid Act gives the Secretary of Health and Human Services (the "Secretary") authority to approve experimental, pilot, or demonstration projects that promote the objectives of the Medicaid program.

44. On October 19, 2005, the Florida Agency for Health Care Administration ("AHCA") received approval for a Medicaid Section 1115 Demonstration Project titled the Florida Medicaid Reform Demonstration (the "Demonstration"). The Demonstration was implemented on July 1, 2006, in Broward and Duval counties, and then expanded to Baker, Clay, and Nassau counties on July 1, 2007. On December 15, 2011, CMS agreed to extend the Demonstration through June 30, 2014, and extended the Demonstration again on July 31, 2014, to run through June 30, 2017.

45. With the latest extension, the Demonstration was renamed the Florida Managed Medical Assistance Program ("MMA Program") and was extended to all counties in Florida subjected to certain provisions that the AHCA is required to meet.

46. For this current approval period, CMS issued a series of Special Terms and Conditions ("STCs") to govern AHCA and the MMA Program. Within the STCs, CMS granted waivers of requirements under section 1902(a) of the Medicaid Act, and expenditure authorities authorizing federal matching of the Demonstration costs not otherwise matchable. However, all requirements of the Medicaid Program expressed in law, regulation, and policy statement, which were not expressly waived or identified as not applicable in the waiver and expenditure authority documents apply to the MMA Program.

47.     During the latest approval period any changes the AHCA seeks to make to the MMA Program, including but not limited to the LIP and sources of non-federal share of funding, must be submitted to CMS as amendments to the MMA Program, which will be subjected to approval at the discretion of the Secretary. The State is not permitted to implement the proposed changes until it has received approval from CMS.

48.     The State is also required to comply with the managed care regulations published in 42 C.F.R. 438, including a requirement that each capitated managed care plan and capitated Provider Service Network ("PSN") maintain an annual Medical Loss Ratio ("MLR") of eighty-five (85) percent for Medicaid operations in the Demonstration counties.

### c.     General Financial Requirements

49.     The State is required to file quarterly reports within sixty (60) days following the end of the quarter and annual reports within one hundred and twenty (120) days after the close of the year.

50.     Using Form CMS-64, the State must provide these quarterly expenditure reports to document the total expenditures for services provided through this Demonstration that are subject to budget neutrality. CMS will in turn provide FFP for allowable Demonstration expenditures only as long as they do not exceed certain pre-defined limits on the costs incurred.

51.     Applicable cost-sharing contributions from enrollees that are collected by the State from enrollees under the MMA Program must be reported to CMS each quarter. Premium and cost-sharing collections should also be reported separately on Form CMS-64 to assure that the collections are properly credited to the MMA Program. In the calculation of expenditures subject to the budget neutrality expenditure limit, premium collections applicable to Demonstration populations will be offset against expenditures.

52.     The standard Medicaid funding process must be used during the MMA Program. The State is required to estimate matchable MMA Program expenditures (total computable and federal share) subject to the budget neutrality expenditure limit and separately report these expenditures by quarter for each federal fiscal year on the Form CMS-37 (narrative section) for both the Medical Assistance Payments ("MAP") and state and Local Administrative Costs ("LAC").

53.     Subject to CMS approval of the source(s) of the non-federal share of funding, CMS shall provide FFP at the applicable federal matching rates for net expenditures and prior adjustments for Medicaid Reform Plan premiums and net expenditures associated with the LIP, among other things.

54.     The State is required to certify that the matching non-federal share of funds for the MMA Program is for state or local monies and that all sources of non-federal funding are compliant with the Medicaid Act and applicable regulations. In addition, all sources of the non-federal share of funding are subject to CMS approval. CMS is permitted to review at any time the sources of the non-federal share of funding for the MMA Program and the State must agree that all funding sources deemed unacceptable by CMS shall be addressed within the timeframes set by CMS.

55.     The State also is required to assure that all health care related taxes comport with section 1903(w) of the Medicaid Act and all other applicable federal statutory and regulatory provisions, as well as the approved Medicaid state plan.

56.     The State must also certify that certain conditions for non-federal share of demonstration expenditures are met, including: 1) units of government, including governmentally-operated health care providers, may certify that the state or local tax dollars have been expended as the non-federal share of funds under the MMA Program; 2) the state may use IGTs to the extent that such funds are derived from state or local tax revenues and are transferred by units of

government within the state and that any transfers from governmentally-operated health care providers must be made in an amount not to exceed the non-federal share of the Medicaid Act payments; 3) health care providers are required, under all circumstances, to retain 100 percent of the reimbursement amounts claimed by the State as MMA Program expenditures.

57.     No pre-arranged agreements (contractual or otherwise) may exist between the health care providers and the state government to return and/or redirect any portion of the Medicaid payments. This confirmation of Medicaid payment retention is made with the understanding that payments that are the normal operating expenses of conducting business (taxes, fees, etc.) are not considered returning and/or redirecting a Medicaid payment.

58.     CMS, under the agreement, has the right to adjust the budget neutrality ceiling to be consistent with enforcement of impermissible provider payments, health care related taxes, new federal statutes, or policy interpretations implemented through state Medicaid Director letters, other memoranda or regulations. CMS also reserves the right to make adjustments to the budget neutrality cap if any health care related tax that was in effect during the base year, or provider related donation that occurred during the base year, is determined by CMS to be in violation of the provider donation and health care related tax provision of 1903(w) of the Medicaid Act.

### d.      The Low Income Pool ("LIP")

59.     The three-year extension granted by CMS authorized the extension of all portions of the MMA Program except for the LIP, which received a one-year extension from July 1, 2014, through June 30, 2015.

60.     The LIP provides government support for the safety net providers that furnish uncompensated care to Medicaid, underinsured and uninsured populations. The LIP is in place to establish new, or enhance existing, innovative programs that meaningfully enhance the quality of care and the health of low income populations.

61.    During the one-year extension, the LIP was to be funded through existing state and local funding arrangements. CMS authorized up to $2,167,718,341 (total computable) for LIP, which included $963,184,508 – the historical spending amount for self-funded hospital rate exemptions and buybacks. CMS conditioned the State's receipt of these funds on the basis that the State had to assure that no such rate exemptions or buybacks would be executed apart from LIP in that year.

62.    In order to receive this funding, the State was required to provide assurances to CMS that 1) the Diagnosis-Related Groups ("DRG") payment would not include any self-funded per claim IGT rate enhancement and 2) the outpatient rates would not include any self-funded IGT rate enhancement for exemptions and buybacks.

63.    The Reimbursement and Funding Methodology Document ("RFMD") was to be prepared by the State to document LIP permissible expenditures, including non-federal share and the total computable expenditures. The RFMD provided that the total computable LIP payments to providers for uncompensated care costs must be supported by uncompensated care costs incurred and reported by providers.

64.    The first draft of the RFMD to be prepared for CMS approval was to be submitted by September 29, 2014. This RFMD was to incorporate a cost review protocol that employed a modified DSH survey tool to report additional costs for the underinsured and cost documentation standards for new LIP provider types. In each demonstration year, the State was required to reconcile LIP payments made to providers to ensure that they did not include unallowed, uncompensated care costs, using the CMS approve RFMD cost review protocol.

65.    Funds from the LIP could be used for health care costs (medical care costs or premiums) that would be within the definition of medical assistance in section 1905(a) of the Medicaid Act. These health care costs could be incurred by the state, hospitals, clinics, or other

provider types to furnish medical care for Medicaid, underinsured, and uninsured populations for which compensation was not available from other payors, including other federal or state programs. Some examples of these costs include: premium payments, payments for Provider Access Systems ("PAS") and insurance products for such services provided to otherwise uninsured individuals, as agreed upon by the State and CMS, and costs for Medicaid services that exceed Medicaid payments (after all other Medicaid Act payments are made, including DSH payments).

66.     Hospital cost expenditures from the LIP were to be paid up to cost and could include mutually agreed upon additional costs. The State, however, was required to agree that it would not receive FFP for Medicaid and LIP payments to hospitals in excess of cost. To ensure that services were paid up to cost and no more, the RFMD defined the cost reporting strategies required to support non-hospital based LIP expenditures.

67.     Sources of non-federal funding were required to be compliant with section 1903(w) of the Medicaid Act and applicable regulations. Federal funds received from other federal programs (unless expressly authorized by federal statute to be used for matching purposes) were deemed impermissible.

### e.     The Report on Medicaid Provider Payment

68.     The terms and conditions for the one-year extension also required measures to strengthen oversight of LIP expenditures to ensure that payments to providers through LIP represented only allowable costs. To meet this requirement, the State was required to provide reports from an independent entity on Medicaid provider payments and financing systems, with a major focus on services currently supported with IGT or LIP funds. The report was also required to include how the State would fund the various payments and how payments to providers corresponded to the amount reported on the Form CMS-64.

69.     The focus of this reporting was on the adequacy, equity, accountability and sustainability of the State's funding mechanisms for these payments, with a primary emphasis on the types of providers supported by IGT or LIP funds.

70.     This report was also to include detailed information on the historical methods of funding hospital payments, the interaction between state funded payments and provider funded payments, describe the composition of payments, including base and supplemental payments, and include how the state funded the various payments and how payments to providers corresponded to the amounts reported on the CMS-64 form.

71.     The provider cost reports enabled CMS to verify uncompensated care costs – CMS would disallow unallowable payments to providers in prior Demonstration years as identified on provider cost reports.

## V.     THE DEFENDANTS' SCHEME

72.     The defendants devised a scheme to obtain reimbursements in violation of the False Claims Act by causing non-bona-fide donations to be made to the Juvenile Welfare Board of Pinellas County, Florida (the "JWB"). The defendants made the donations in order to ultimately recoup the amount of those donations plus matching federal funding, in violation of the Medicaid Act and the regulations promulgated thereunder.

73.     The defendants' scheme involved (1) donations from the defendants, as private, non-public entities, to the JWB, (2) an agreement by the JWB to transfer all but ten percent of the donation via IGT to the Florida AHCA, and (3) an intention to thereby receive Medicaid funding inappropriately boosted by matching federal funding.

74.     Because the donations originated with the private, non-public entities (the defendants), the donations were not "bona-fide" donations as required to trigger federal matching funding under Medicaid laws and regulations.

16

75.     Each of the defendants received significant reimbursements from Medicaid funding for the fiscal years ending September 30, 2012, September 30, 2013, September 30, 2014, and September 30, 2015.

76.     In essence, the defendants paid themselves to increase the federal matching funding on Medicaid patients, and paid the JWB a ten percent fee in order to accomplish the scheme.

77.     Each claim for Medicaid funding by each defendant paid in part through the matching federal grants triggered by non-bona-fide donations was false, in that the claiming defendant was not permitted to recover federal matching funds triggered by their own non-bona-fide donations.

78.     The defendants engaged in this scheme in 2011 through at least 2015, thereby obtaining by the false claims at least $52,462,000 in additional Medicaid funding through Federal Medicaid Assistance Percentages (FMAP) obtained by non-bona-fide donations.

### Fiscal Year Ending September 30, 2012

79.     In the fiscal year ending September 30, 2012, defendant All Children's donated approximately $3,500,000 to the JWB.

80.     In the fiscal year ending September 30, 2012, JWB made a non-bona fide IGT in the amount of approximately $3,150,000 to the Florida ACHA, retaining approximately 10% ($350,000) at the JWB.

81.     Based upon the non-bona fide IGT of approximately $3,150,000, the United States made a matching payment, an FMAP, to the Florida ACHA in the amount of approximately $4,461,783.

82.     All Children's thereafter falsely claimed an entitlement to Medicaid funding that included the FMAP payment made because of the defendants' non-bona-fide donations.

17

**Fiscal Year Ending September 30, 2013**

83.    In the fiscal year ending September 30, 2013, defendants All Children's and Bayfront donated approximately $5,984,244 to the JWB.

84.    In the fiscal year ending September 30, 2012, JWB made a non-bona fide IGT in the amount of approximately $5,385,820 to the Florida ACHA, retaining approximately 10% ($598,424) at the JWB.

85.    Based upon the non-bona fide IGT of approximately $5,385,820, the United States made a matching payment, an FMAP, to the Florida ACHA in the amount of approximately $8,291,147.

86.    All Children's and Bayfront thereafter falsely claimed an entitlement to Medicaid funding that included the FMAP payment made because of the defendants' non-bona-fide donations.

**Fiscal Year Ending September 30, 2014**

87.    In the fiscal year ending September 30, 2014, defendants All Children's, Bayfront, Morton, Mease, and Community donated approximately $19,614,178 to the JWB.

88.    In the fiscal year ending September 30, 2014, JWB made a non-bona fide IGT in the amount of approximately $17,652,760 to the Florida ACHA, retaining approximately 10% ($1,961,418) at the JWB.

89.    Based upon the non-bona fide IGT of approximately $17,652,760, the United States made a matching payment, an FMAP, to the Florida ACHA in the amount of approximately $27,981,498.

90.    All Children's, Bayfront, Morton, Mease, and Community thereafter falsely claimed an entitlement to Medicaid funding that included the FMAP payment made because of the defendants' non-bona-fide donations.

18

**Fiscal Year Ending September 30, 2015**

91.     In the fiscal year ending September 30, 2015, defendants All Children's, Morton, Mease, and Community donated approximately $7,910,023 to the JWB.

92.     In the fiscal year ending September 30, 2015, defendant Bayfront used a different entity than JWB to effectuate the scheme, but participated in receipt of the illicitly obtained Medicaid reimbursements nonetheless.

93.     In the fiscal year ending September 30, 2015, JWB made a non-bona fide IGT in the amount of approximately $7,119,021 to the Florida ACHA, retaining approximately 10% ($791,002) at the JWB.

94.     Based upon the non-bona fide IGT of approximately $7,119,021, the United States made a matching payment, an FMAP, to the Florida ACHA in the amount of approximately $11,727,571.

95.     All Children's, Bayfront, Morton, Mease, and Community thereafter falsely claimed an entitlement to Medicaid funding that included the FMAP payment made because of the defendants' non-bona-fide donations.

96.     The defendants knew or recklessly disregarded the fact that they were not permitted to obtain Medicaid reimbursements inflated by virtue of their non-bona-fide donations for fiscal years ending 2012-2015.

97.     For example, Bayfront's parent corporation was involved in an unrelated case in New Mexico in which the government asserted that a similar scheme was illegal.

98.     In addition, Bayfront internally reserved for accounting purposes moneys obtained through the scheme described above, noting that such moneys were "IGT Dollars at Risk," implicitly recognizing that the funds were obtained in a manner contrary to the law.

19

99.     On information and belief, Bayfront also submitted falsified cost reports by including the non-bona fide donations within the category of allowable expenses.

100.    Similarly, CMS promulgated rules and opinions explaining that non-bona-fide donations could not be used to inflate Medicaid reimbursement amounts through FMAPs, and defendants were all familiar with CMS rules and regulations.

## FIRST CAUSE OF ACTION

Violations of the False Claims Act:
Presentation of False Statements Material to False Claims
31 U.S.C. § 3729(a)(1)(A)

101.    The foregoing paragraphs 1 through 100 are incorporated by reference as if fully set forth herein.

102.    The FCA imposes liability on any person who knowingly presents, or causes to be presented, to the United States for payment or approval any false or fraudulent claims for reimbursement. 31 U.S.C. § 3729(a)(1)(A).

103.    By virtue of the acts described above, defendants knowingly presented, and caused to be presented, false or fraudulent claims for payment or approval to the United States.

104.    Defendants knowingly presented, and caused to be presented, false or fraudulent claims for Medicaid reimbursement that were inflated with federal matching funding payments made because of non-bona-fide donations.

105.    By virtue of the false or fraudulent claims that defendants presented and/or caused to be presented, the United States suffered damages in an amount to be determined at trial, trebled as per the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation. Additionally, Plaintiff-Relator Mr. Bomar is entitled to share in any recovery obtained as per section 3729 of the FCA. *Id.* § 3730.

## SECOND CAUSE OF ACTION

Violations of the False Claims Act:
Presentation of False Statements to get False Claims Paid
(31 U.S.C. § 3729(a)(1)(B))

106.   The foregoing paragraphs 1 through 100 are incorporated by reference as if set forth fully herein.

107.   The FCA imposes liability on any person who knowingly makes, uses or causes to be made or used false records or statements material to a false or fraudulent claim presented to the United States for payment or approval for reimbursement. 31 U.S.C. § 3729(a)(1)(B).

108.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements to have false or fraudulent claims paid by the United States.

109.   Defendants knowingly made, used, or caused to be made or used false records or statements to get paid false or fraudulent claims for Medicaid reimbursement that were inflated with federal matching funding payments made because of non-bona-fide donations.

110.   By virtue of the false or fraudulent claims that defendants made and/or caused to be made, the United States suffered damages in an amount to be determined at trial, trebled as per the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation. Additionally, Plaintiff-Relator Mr. Bomar is entitled to share in any recovery obtained as per section 3729 of the FCA. *Id.* § 3730.

## THIRD CAUSE OF ACTION

Violations of the False Claims Act:
Conspiracy to Commit Violation of the FCA
(31 U.S.C. § 3729(a)(1)(C))

111. The foregoing paragraphs 1-100 are incorporated by reference as if set forth fully herein.

112. The FCA imposes liability on any person who conspires to violate the substantive FCA provisions. 31 U.S.C. § 3729(a)(l)(C).

113. Defendants conspired to commit a violation of the FCA, namely violations of 31 U.S.C. § 3729(a)(l)(A) and (B) when they engaged in the scheme as described above.

114. By virtue of the defendants' conspiracy to commit a violation of the FCA, the United States suffered damages in an amount to be determined at trial, trebled as per the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation. Additionally, Plaintiff-Relator Mr. Bomar is entitled to share in any recovery obtained as per section 3729 of the FCA. *Id.* § 3730.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator Mr. Bomar demands and prays that judgment be entered in his and the United States' favor against defendants as follows:

1) As to all Counts, that defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*.

2) As to the First Count under the FCA, for the amount of the United States' damages, trebled as required by law; such civil penalties as are required by law of not less than $5,500 and not more than $11,000; that plaintiff-relator be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA and all costs of this action including attorneys' fees and expenses; and that the United States and plaintiff-relator be granted all such other relief as the Court deems just and

proper.

3)    As to the Second Count under the FCA, for the amount of the United States' damages, trebled as required by law; such civil penalties as are required by law of not less than $5,500 and not more than $11,000; that plaintiff-relator be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA and all costs of this action including attorneys' fees and expenses; and that the United States and plaintiff-relator be granted all such other relief as the Court deems just and proper.

4)    As to the Third Count under the FCA, for the amount of the United States' damages, trebled as required by law; such civil penalties as are required by law of not less than $5,500 and not more than $11,000; that plaintiff-relator be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA and all costs of this action including attorneys' fees and expenses; and that the United States and plaintiff-relator be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff-Relator Mr. Bomar, on behalf of himself and the United States, demands a jury trial in this case pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: December 2, 2016                    Respectfully submitted,

/s/ Stephen S. Stallings
Stephen S. Stallings, Esquire
FL ID No. 958859
attorney@stevestallingslaw.com
The Osterling Building
228 Isabella Street
Pittsburgh, PA 15212
T: 412.322.7777

*Attorney for Plaintiff-Relator*
*Mr. Larry Bomar*

## CERTIFICATE OF SERVICE

I, Stephen S. Stallings, Esq., hereby certify that on this the 2nd day of December 2016, a true and correct copy of the foregoing Complaint, has been served via certified first-class United States mail upon the following parties:

Loretta E. Lynch

United States Attorney General

U.S. Department of Justice

950 Pennsylvania Avenue, N.W.

Washington, D.C. 20530-001

A. Lee Bentley, III

United States Attorney

United States Attorney's Office for the Middle District of Florida

400 N. Tampa Street

Suite 3200

Tampa, Florida 33602

*/s/ Stephen S. Stallings*
Stephen S. Stallings, Esquire