**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA
*ex rel*. LARRY BOMAR,

      Plaintiffs,

v.                                                     Case No. 8:16-CV-3310-MSS-JSS

BAYFRONT HMA
MEDICAL CENTER, LLC,

      Defendants.

_____

### PLAINTIFF/RELATOR'S FIRST AMENDED COMPLAINT

      Plaintiff-Relator, Larry Bomar ("Mr. Bomar") by and through undersigned counsel, pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq*., and on behalf of himself and plaintiff United States of America, hereby sets forth, based upon personal knowledge and relevant documents, the following Amended Complaint against defendant, Bayfront HMA Medical Center, LLC, ("Bayfront"), and alleges as follows:

### I.  NATURE OF THE ACTION

      1.    This is an action to recover damages and civil penalties on behalf of the United States arising out of false and/or fraudulent records, statements and claims presented or made and used, or caused to be made and used by Bayfront in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. (the "FCA").

1

2.      The FCA imposes liability for a civil penalty of up to $11,000 per claim, plus treble damages, upon any person who: knowingly presents or causes the submission to the United States of a false claim; knowingly makes or causes to be made a false statement or record related to the submission to the United States of a false claim; knowingly conceals or avoids an obligation to pay the United States; or conspires to violate any of the FCA's substantive provision. *See* 32 U.S.C. § 3729(a)(1)(A), (B), (C), & (G).

3.      Liability under the FCA attaches when a defendant knowingly seeks payment, or causes to seek payment, from the government that the government would not reimburse if it knew of the violation. *Id*. § 3729(a)(1). The requisite "knowledge" can include not only actual knowledge as to the impropriety of the claim but also acts taken in deliberate ignorance of the truth or falsity of such information and acts taken in reckless disregard of the truth or falsity of the information.

4.      The FCA permits any person who has information about an FCA violation to bring an action under the FCA on behalf of himself and the United States Government, and to share in any resulting recovery, as well as to recover reasonable costs, expenses and attorney's fees from Bayfront if the action is successful. *See Id*. § 3730.

5.      The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow

the government time to conduct its own investigation and to determine whether to join suit. Because the case has previously been unsealed, the government has chosen not to intervene at this juncture, a Court order permitted the filing of an amended complaint, and the Amended Complaint does not add new claims or new parties, this Amended Complaint need not be filed under seal pursuant to the FCA.

6.     Additionally, the FCA prohibits employers from discriminating, in any manner affecting the terms and condition of employment, against employees because of lawful acts done in furtherance of an actual or potential FCA lawsuit.

7.     Based on the foregoing and as set forth fully below, Plaintiff-Relator Mr. Bomar hereby seeks to recover, on behalf of the United States, damages and civil penalties arising out of defendant's conduct in presenting false or fraudulent statements or claims, causing the making or using of false or fraudulent statement or claims, and conspiring to commit these violations of the FCA, as it relates to Bayfront's scheme to obtain tens of millions of dollars in illicit Medicaid reimbursement through non-bona-fide donations to a local government entity, and Bayfront's making of materially false statements on Bayfront's cost reports regarding the nature of the non-bona-fide donations.

## II.    THE PARTIES

8.     Mr. Bomar, *qui tam* relator, is a citizen of the United States and resides in Seminole, Florida in the Middle District of Florida. Mr. Bomar was

employed as the Reimbursement Manager by the corporate predecessor to Bayfront from April of 2001 to March 31, 2013, and by defendant Bayfront from April 1, 2013, through September 30, 2016. In his role as Reimbursement Manager, Mr. Bomar worked directly on Bayfront cost reporting and Medicaid reimbursement matters, and had access to non-public Bayfront information showing how Bayfront treated Medicaid reimbursement issues, including the non-bona-fide donations at issue in this case. As a result, Mr. Bomar has personal knowledge of, and experience with, various types of illegal actions and activities by the defendant Bayfront as outlined in detail in the following paragraphs of this Complaint.

9.     Bayfront HMA Medical Center, LLC ("Bayfront") was a Florida corporation with its principal place of business at 701 6th Street South, St. Petersburg, Florida, that operated a hospital known as Bayfront Health St. Petersburg in the Middle District of Florida.

## III.   JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367(a), as well as, 31 U.S.C. § 3732, which specifically vests this Court with subject matter jurisdiction over actions pursuant to 31 U.S.C. §§ 3729 and 3730.

11.     This Court has personal jurisdiction over Bayfront pursuant to 31 U.S.C. § 3732(a) because under this section nationwide service of process is

4

proper, the acts committed by Bayfront in violation of the FCA occurred in the Middle District of Florida, and Bayfront can be found, resides, and/or transacts business in the Middle District of Florida. Defendant has already been served with the original complaint in this action, has sought relief under Rule 12 without asserting a personal jurisdiction defense, and thus has waived challenging personal jurisdiction.

12.    Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because Bayfront can be found in and transacts business in this District and because a substantial part of the events giving rise to the claims alleged in this action occurred in this District. Defendant has already been served with the original complaint in this action, has sought relief under Rule 12 without asserting a venue defense, and thus has waived challenging venue.

13.    Consistent with 31 U.S.C. § 3730(e), there has been no public disclosure of the material allegations or transactions described in this Amended Complaint prior to the filing of the original Complaint, and the allegations set forth and transactions described herein are based upon the independent knowledge and belief of Plaintiff-Relator Mr. Bomar, who qualifies as an "original source" for purposes of 31 U.S.C § 3730(e)(4), even as to matters subsequently disclosed.

## IV.   APPLICABLE LAW

### A.   The False Claims Act

14.   The False Claims Act provides that any person who knowingly presents or causes to be presented to the United States any false or fraudulent claim for reimbursement is liable to the United States for a civil penalty of between $5,500 and $11,000 for each such claim, plus triple the damages sustained by the United States as a result of such false claims. 31 U.S.C. § 3729(a)(l)(A).

15.   In addition, any person who knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim shall be liable to the United States for the same penalties. *Id*. § 3729(a)(l)(B).

16.   The FCA further imposes liability upon any person who, with respect to an obligation to pay or reimburse the government, knowingly: (1) "makes, uses, or causes to be made or used, a false record or statement material to;" (2) "knowingly conceals;" or (3) "knowingly and improperly avoids or decreases" such obligation. *Id*. § 3729(a)(l)(G).

17.   An FCA violation is "knowing" if Bayfront "(i) has actual knowledge . . . ; (ii) acts in deliberate ignorance of the truth or falsity . . .; or (iii) acts in reckless disregard of the truth or falsity" of the violation. *Id*. § 3729(b)(l).

18.   A defendant need not act with the "specific intent to defraud" in order to knowingly violate the FCA. *Id*. § 3729(a)(l)(B).

19.    A person who conspires to violate the substantive FCA provisions described above is also liable under the FCA. *Id*. § 3729(a)(l)(C).

20.    Certain persons who know of a false or fraudulent claim against the United States may bring an action on behalf of himself and the United States, and share in any recovery obtained, under Section 3729 of the FCA. *Id*. § 3730.

### B.    Medicaid Program Background

21.    Title XIX of the Social Security Act (the "Medicaid Act") authorizes federal grants to the states for their Medicaid programs to provide medical assistance to persons with limited income and resources. Medicaid programs are administered by the states in accordance with federal regulations. State Medicaid agencies conduct their programs according to a Medicaid state plan approved by the Center for Medicare & Medicaid Services ("CMS"). To carry out the mandates of the Medicaid program, the state agency pays providers for medical care and services provided to eligible Medicaid recipients. Providers that wish to participate in the Medicaid program must agree to comply with certain requirements specified in a provider agreement.

22.    While Medicaid programs are administered by the states, they are jointly financed by the federal and state governments. The federal government pays its share of medical assistance expenditures to the state on a quarterly basis according to statements of expenditures submitted by the state and a formula described in sections 1903 and 1905(b) of the Medicaid Act. The amount

of the federal share of medical assistance expenditures is called the Federal Financial Participation ("FFP"). The state pays its share of medical assistance expenditures from state and local government funds in accordance with section 1902(a)(2) of the Medicaid Act.

23.     Different levels of federal funding are provided to different states depending on the individual state's need. The minimum federal matching rate share is 50% of total program costs. In Florida, the annual federal share of Medicaid expenditures during the period relevant to this Complaint approached or exceeded a percentage of total program costs.

###     1.     State Funding Abuses: Non-Bona Fide Provider Donations, Upper Payment Limits and Intergovernmental Transfers

24.     A history of past abuses have undermined the proper balance in Medicaid financing actually provided by the state and federal governments. Since 1991, federal Medicaid regulations have excluded from the FFP state medical assistance expenditures for which the states' and/or its local government entities' share of Medicaid costs are obtained from pass-through provider donations or revenues generated by certain health-care-specific taxes. The rules governing this provision also include provisions that establish limits on the aggregate amount of payments a state may make to Disproportionate Share Hospitals ("DSH") for which FFP is available.

25.     Under section 1903(w) of the Medicaid Act, a reduction in FFP will

occur if a state receives donations made by, or on behalf of, health care providers unless the donations are "bona fide" donations or meet out-stationed eligibility worker donation requirements. The law also specifies the types of health care related taxes a state is permitted to receive without a reduction in FFP.

26.     "Donations" from health care providers to state or local governments that are made with the express or implied understanding that such funds will be used for the purpose of fulfilling state matching fund obligations to the Medicaid program for the benefit of the "donating" provider do not meet the definition of "bona fide" donations that are exempt from reductions in FFP. *See* 42 C.F.R. § 433.54. The result of such arrangements is that there is no true state funded match of federal funds used to pay such Medicaid expenditures. Rather, there is only a hold harmless "donation" of funds by the provider hospital itself, which is ultimately returned to the hospital – along with additional "matching" funds from the federal government – within the year of the so-called "donation."

27.     A hold harmless situation exists, therefore, if there is a positive correlation between the agreement and the Medicaid payments, Medicaid payments are conditioned upon the receipt of a donation from a private entity, or if there is a guarantee that the private entity will see a return of some, or all of that donation through a Medicaid payment.

28.     Under such improper arrangements, providers make it possible for state or local government officials to substantially increase federal Medicaid

payments to providers at no actual cost to state or local governments. Such arrangements thus undermine the safe-guards Congress designed into the Medicaid program to condition certain categories of federal Medicaid spending (up to established overall limits) on the willingness of state and local governments to bear a defined, fair portion of the extra costs in exchange for the additional benefits such payments provide Medicaid participants within their jurisdiction.

29.     If CMS is aware of these improper arrangements, CMS will not approve state plan amendments ("SPAs") that include non-bona fide donations as a portion, or all, of the non-Federal share of the Medicaid payments because Federal Medicaid payments must be reduced by the sum total of non-bona fide provider-related donations received by the State.

30.     Another area of state funding abuse that Congress and CMS explicitly has sought to curb in recent years is the misuse of the Medicaid Upper Payment Limit ("UPL") and Intergovernmental Transfers ("IGTs"). Effective March 19, 2002, for example, a final rule went into effect that lowered the UPL for non-state government owned or operated hospitals from 150 percent to 100 percent. This change was made in substantial part because of the federal government's discovery of the misuse of IGTs to divert much of the supplemental Medicaid payments that were previously justified as being needed for the specific benefit of such public hospitals for use by the States for other purposes – which

left the government owned or operated hospitals with only a fraction of the supplemental payments and caused funding of such payments to be paid in actual effect 100% by the federal government. *Federal Register*, 67, no. 13:2602-11 (January 18, 2002).

31.    States are required by CMS to submit UPL calculations to demonstrate that payments to Medicaid providers are economical and efficient and that both base and supplemental payments are within the UPL. States are permitted to pay classes of providers up to the specified aggregate UPL for that class and CMS reviews the reasonableness of fee-for-service payment rates to help ensure that payments are efficient and economical. However, payments that exceed the UPL limit are considered out of compliance with the Federal statute and regulations.

32.    In the context of the Medicaid program, some public-private arrangements (a relationship between a private entity and a government entity in which the private entity agrees to provide a service or some other in-kind transfer of value to further the purposes of the government entity) also include provisions that the government will make an IGT to the Medicaid agency, and the private providers that have signed the agreement then become eligible for a Medicaid supplemental payment or special add-on to the base payment rate that may be funded by the IGT from the government entity under the same arraignment.

33. This type of arrangement would not be considered a bona fide donation under Medicaid requirements regardless of the expressed intent of the providers and the governmental agencies; because, when there is an effective return of some, or all, of the donation to the private provider through Medicaid supplemental payments, a hold harmless situation exists. More specifically, any arrangement that obligates a private hospital to either assume the programmatic responsibility of a unit of government or sign lease agreements at an amount that is greater than fair market value would be considered a hold harmless situation.

34. Any donation that is tied in any way, directly or indirectly, to Medicaid reimbursements under the Medicaid State plan would therefore not be considered bona fide.

35. While the new regulations continued to permit states to provide special supplemental benefits to non-state government owned or operated hospitals, based on their purported special needs and roles in serving the Medicaid populations, CMS concluded that the abuses that had become apparent demonstrated that the need was less than previously thought and that there was a need to restore greater equity among hospital providers and access provider types. *Id.* at 2603.

## 2. Florida's Managed Medical Assistance Program Background

36.     Section 1115 of the Medicaid Act gives the Secretary of Health and Human Services (the "Secretary") authority to approve experimental, pilot, or demonstration projects that promote the objectives of the Medicaid program.

37.     On October 19, 2005, the Florida Agency for Health Care Administration ("AHCA") received approval for a Medicaid Section 1115 Demonstration Project titled the Florida Medicaid Reform Demonstration (the "Demonstration"). The Demonstration was implemented on July 1, 2006, in Broward and Duval counties, and then expanded to Baker, Clay and Nassau counties on July 1, 2007. On December 15, 2011, CMS agreed to extend the Demonstration through June 30, 2014, and extended the Demonstration again on July 31, 2014, to run through June 30, 2017.

38.     With the latest extension, the Demonstration was renamed the Florida Managed Medical Assistance Program ("MMA Program") and was extended to all counties in Florida subjected to certain provisions that the AHCA is required to meet.

39.     For this current approval period, CMS issued a series of Special Terms and Conditions ("STCs") to govern AHCA and the MMA Program. Within the STCs, CMS granted waivers of requirements under section 1902(a) of the Medicaid Act, and expenditure authorities authorizing federal matching of the Demonstration costs not otherwise matchable. However, all requirements of the

Medicaid Program expressed in law, regulation, and policy statement, which were not expressly waived or identified as not applicable in the waiver and expenditure authority documents apply to the MMA Program.

40.    During the latest relevant approval period, any changes the AHCA sought to make to the MMA Program, including but not limited to the LIP and sources of non-federal share of funding, must have been submitted to CMS as amendments to the MMA Program, which would have been subjected to approval at the discretion of the Secretary. The State was not permitted to implement such proposed changes until it had received approval from CMS.

41.    The State was also required to comply with the managed care regulations published in 42 CFR 438, including a requirement that each capitated managed care plan and capitated provider service network ("PSN") maintain an annual Medical Loss Ratio ("MLR") of eighty-five (85) percent for Medicaid operations in the Demonstration counties.

### C.    General Financial Requirements

42.    The State is required to file quarterly reports within sixty (60) days following the end of the quarter and annual reports within one hundred and twenty (120) days after the close of the year.

43.    Using Form CMS-64, the State must provide these quarterly expenditure reports to document the total expenditures for services provided through this Demonstration that are subject to budget neutrality. CMS will in

turn provide FFP for allowable Demonstration expenditures only as long as they do not exceed certain pre-defined limits on the costs incurred.

44.     Applicable cost-sharing contributions from enrollees that are collected by the State from enrollees under the MMA Program must be reported to CMS each quarter. Premium and cost-sharing collections should also be reported separately on Form CMS-64 to assure that the collections are properly credited to the MMA Program. In the calculation of expenditures subject to the budget neutrality expenditure limit, premium collections applicable to demonstration populations will be offset against expenditures.

45.     The standard Medicaid funding process must be used during the MMA Program. The State is required to estimate matchable MMA Program expenditures (total computable and federal share) subject to the budget neutrality expenditure limit and separately report these expenditures by quarter for each federal fiscal year on the Form CMS-37 (narrative section) for both the Medical Assistance Payments ("MAP") and state and Local Administrative Costs ("LAC").

46.     Subject to CMS approval of the source(s) of the non-federal share of funding, CMS shall provide FFP at the applicable federal matching rates for net expenditures and prior adjustments for Medicaid Reform Plan premiums and net expenditures associated with the LIP, among other things.

47.     The State is required to certify that the matching non-federal share of funds for the MMA Program is for state/local monies and that all sources of non-federal funding are compliant with the Medicaid Act and applicable regulations. In addition, all sources of the non-federal share of funding are subject to CMS approval. CMS is permitted to review at any time the sources of the non-federal share of funding for the MMA Program and the State must agree that all funding sources deemed unacceptable by CMS shall be addressed within the timeframes set by CMS.

48.     The State also is required to assure that all health care related taxes comport with section 1903(w) of the Medicaid Act and all other applicable federal statutory and regulatory provisions, as well as the approved Medicaid state plan.

49.     The State must also certify that certain conditions for non-federal share of demonstration expenditures are met, which includes: 1) units of government, including governmentally-operated health care providers, may certify that the state or local tax dollars have been expended as the non-federal share of funds under the MMA Program; 2) the state may use IGTs to the extent that such funds are derived from state or local tax revenues and are transferred by units of government within the state and that any transfers from governmentally-operated health care providers must be made in an amount not to exceed the non-federal share of the Medicaid Act payments; 3) health care

providers are required, under all circumstances, to retain 100 percent of the reimbursement amounts claimed by the State as MMA Program expenditures.

50.     No pre-arranged agreements (contractual or otherwise) may exist between the health care providers and the state government to return and/or redirect any portion of the Medicaid payments. This confirmation of Medicaid payment retention is made with the understanding that payments that are the normal operating expenses of conducting business (taxes, fees, etc.) are not considered returning and/or redirecting a Medicaid payment.

51.     CMS, under the agreement, has the right to adjust the budget neutrality ceiling to be consistent with enforcement of impermissible provider payments, health care related taxes, new federal statutes, or policy interpretations implemented through state Medicaid Director letters, other memoranda or regulations. CMS also reserves the right to make adjustments to the budget neutrality cap if any health care related tax that was in effect during the base year, or provider related donation that occurred during the base year, is determined by CMS to be in violation of the provider donation and health care related tax provision of 1903(w) of the Medicaid Act.

## 1.     The Low Income Pool ("LIP")

52.     A three-year extension granted by CMS authorized the extension of all portions of the MMA Program except for the LIP, which received a one-year extension from July 1, 2014 through June 30, 2015.

53.     The LIP provides government support for the safety net providers that furnish uncompensated care to Medicaid, underinsured and uninsured populations. The LIP is in place to establish new, or enhance existing, innovative programs that meaningfully enhance the quality of care and the health of low income populations.

54.     During the one-year extension, the LIP was to be funded through existing state and local funding arrangements. CMS authorized up to $2,167,718,341 which included $963,184,508 – the historical spending amount for self-funded hospital rate exemptions and buybacks. CMS conditioned the State's receipt of these funds on the basis that the State had to assure that no such rate exemptions or buybacks would be executed apart from LIP in that year.

55.     In order to receive this funding, the State was required to provide assurances to CMS that 1) the diagnosis-related groups ("DRG") payment would not include any self-funded per claim IGT rate enhancement and 2) the outpatient rates would not include any self-funded IGT rate enhancement for exemptions and buybacks.

56.     The Reimbursement and Funding Methodology Document ("RFMD") was to be prepared by the State to document LIP permissible expenditures, including non-federal share and the total computable expenditures. The RFMD provided that the total computable LIP payments to providers for

uncompensated care costs must be supported by uncompensated care costs incurred and reported by providers.

57.     The first draft of the RFMD to be prepared for CMS approval was to be submitted by September 29, 2014. This RFMD was to incorporate a cost review protocol that employed a modified DSH survey tool to report additional costs for the underinsured and cost documentation standards for new LIP provider types. In each demonstration year, the State was required to reconcile LIP payments made to providers to ensure that they did not include unallowed, uncompensated care costs, using the CMS approve RFMD cost review protocol.

58.     Funds from the LIP could be used for health care costs (medical care costs or premiums) that would be within the definition of medical assistance in Section 1905(a) of the Medicaid Act. These health care costs could be incurred by the state, by hospitals, clinics, or by other provider types to furnish medical care for Medicaid, underinsured and uninsured populations for which compensation was not available from other payors, including other federal or state programs. Some examples of these costs include: premium payments, payments for provider access systems ("PAS") and insurance products for such services provided to otherwise uninsured individuals, as agreed upon by the State and CMS, and costs for Medicaid services that exceed Medicaid payments (after all other Medicaid Act payments are made, including DSH payments).

59.     Hospital cost expenditures from the LIP were to be paid up to cost and could include mutually agreed upon additional costs. The State, however, was required to agree that it would not receive FFP for Medicaid and LIP payments to hospitals in excess of cost. To ensure that services were paid up to cost and no more, the RFMD defined the cost reporting strategies required to support non-hospital based LIP expenditures.

60.     Sources of non-Federal funding were required to be compliant with section 1903(w) of the Medicaid Act and applicable regulations. Federal funds received from other federal programs (unless expressly authorized by federal statute to be used for matching purposes) were deemed impermissible.

### 2.     The Report on Medicaid Provider Payment

61.     The terms and conditions for the one-year extension also required measures to strengthen oversight of LIP expenditures to ensure that payments to providers through LIP represented only allowable costs. To meet this requirement, the State was required to provide reports from an independent entity on Medicaid provider payments and financing systems, with a major focus on services currently supported with IGT or LIP funds. The report was also required to include how the State would fund the various payments and how payments to providers corresponded to the amount reported on the Form CMS-64.

62.     The focus of this reporting was on the adequacy, equity, accountability and sustainability of the State's funding mechanisms for these payments, with a primary emphasis on the types of providers supported by IGT or LIP funds.

63.     This report was also to include detailed information on the historical methods of funding hospital payments, the interaction between state funded payments and provider funded payments, describe the composition of payments, including base and supplemental payments, and include how the state funded the various payments and how payments to providers corresponded to the amounts reported on the CMS-64 form.

64.     The provider cost reports enabled CMS to verify uncompensated care costs – CMS would disallow unallowable payments to providers in prior Demonstration years as identified on provider cost reports.

## V.     BAYFRONT'S NON-BONA-FIDE DONATION SCHEME

65.     Bayfront and others devised a scheme to obtain reimbursements in violation of the False Claims Act by causing non-bona-fide donations to be made to the Juvenile Welfare Board of Pinellas County, Florida (the "JWB")[1]. Bayfront made the donations in order to ultimately recoup reimbursements through, among other things, rates that would be fraudulently increased as a result of the

---

[1] On information and belief, defendant employed the non-bona-fide donation scheme in other Florida counties as well.

donations plus matching federal funding, in violation of the Medicaid Act and the regulations promulgated thereunder.

66.   Bayfront's scheme involved (1) donations from Bayfront and other providers, as private, non-public entities, to the JWB, (2) an agreement by the JWB to transfer all but ten percent of the donation via IGT to the Florida AHCA, and (3) an intention to thereby receive Medicaid funding inappropriately boosted by matching federal funding.

67.   Because the donations originated with a private, non-public entity (Bayfront), the donations were not "bona-fide" donations as required to trigger federal matching funding under Medicaid laws and regulations.

68.   Bayfront received significant reimbursements from Medicaid funding for the fiscal years ending September 30, 2013, September 30, 2014, and September 30, 2015.

69.   In essence, Bayfront paid itself to increase the federal matching funding on Medicaid patients, and paid the JWB a ten percent fee in order to accomplish the scheme.

70.   Each claim for Medicaid funding by Bayfront paid in part through the matching federal grants triggered by non-bona-fide donations was false, in that the claiming defendant was not permitted to recover federal matching funds triggered by their own non-bona-fide donations.

71.     As detailed below and in the attached Exhibit 1 to this Amended Complaint, defendant submitted thousands of specific Medicaid reimbursement requests at rates determined and inflated specifically because of the non-bona-fide donation scheme. In addition to these specific reimbursement requests, all of the claims for Medicaid reimbursement defendant made that were inflated by the non-bona-fide donation scheme were false.

72.     Bayfront engaged in this scheme beginning at least as early as the fiscal year ending September 30, 2013 through at least as late as 2015, thereby obtaining by the false claims tens of millions of dollars in additional Medicaid funding through FMAPs obtained by non-bona-fide donations.

## VI.    BAYFRONT'S FALSE CLAIMS

### Fiscal Year Ending September 30, 2013

73.     In the fiscal year ending September 30, 2013, defendant and other providers in Pinellas County donated a total of approximately $5,984,244 to the JWB pursuant to the non-bona-fide donation scheme. *See* Spreadsheet of JWB donations from private providers attached as Exhibit 2 to this Amended Complaint.

74.     Bayfront, after being acquired by HMA, donated approximately $429,971 to the JWB in April of 2013, pursuant to the non-bona-fide donation scheme. *See* Spreadsheet of Bayfront Donations to JWB attached as Exhibit 3 to this Amended Complaint.

23

75.     Bayfront, after being acquired by HMA, donated approximately $429,971 to the JWB in May of 2013, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

76.     Bayfront, after being acquired by HMA, donated approximately $429,971 to the JWB in June of 2013, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

77.     Bayfront, after being acquired by HMA, donated approximately $429,971 to the JWB in July of 2013, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

78.     Bayfront, after being acquired by HMA, donated approximately $429,971 to the JWB in August of 2013, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

79.     Bayfront, after being acquired by HMA, donated approximately $761,236 to the JWB in September of 2013, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

80.     In the fiscal year ending September 30, 2013, JWB made a non-bona fide IGT in the amount of approximately $5,385,820 to the Florida ACHA, retaining approximately 10% ($598,424) at the JWB. *See* Exhibit 2.

81.     Based upon the non-bona fide IGT of approximately $5,385,820, the United States made a matching payment called a Federal Medicaid Assistance

Percentage (FMAP) to the Florida ACHA in the amount of approximately $8,291,147. _See_ Exhibit 2.

82.     Bayfront thereafter falsely claimed an entitlement to Medicaid funding that included the FMAP payment made because of Bayfront's non-bona-fide donations.

83.     The amount and rate at which Bayfront sought and received Medicaid reimbursement was inflated, fraudulently, as a result of Bayfront's non-bona-fide donations made during the fiscal year ending September 30, 2013.

84.     Exhibit 1 to this Amended Complaint shows actual in-patient Medicaid reimbursement claims made and payments received by Bayfront for specific patient encounters occurring in the first quarter of calendar year 2013. The names and other patient identifiers, while visible on the original document, have been redacted from Exhibit 1. As detailed in Exhibit 1, in the first quarter of calendar year 2013 alone, Bayfront submitted specific in-patient Medicaid reimbursement claims for approximately 615 individual patients, each at reimbursement rates inflated by the non-bona-fide donation scheme. These claims made for reimbursements on these approximately 615 patients resulted in Bayfront receiving over $3.4 million in paid reimbursements, again for just in-patients treated in the first quarter of 2013 alone.

85.     Bayfront also misrepresented the nature of its donations to JWB on its cost reports by classifying those donations as "other taxes," and claiming them

as expenses. Federal regulations and guidelines do not allow providers to treat as expenses on cost reports "costs incurred by providers for gifts or donations." *See* Centers for Medicare and Medicaid Services ("CMS") "The Provider Reimbursement Manual" at § 2105.7.

86.   As reflected on Exhibit 4 to this Amended Complaint, Bayfront fraudulently mis-classified the non-bona-fide donations made in the fiscal year ending September 30, 2013, as "Other Taxes."

87.   Each cost report submitted contained the following certification and acknowledgement by Bayfront:

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

88.   On or about September 17, 2014, Bayfront submitted a cost report for a period covering the donations made to the JWB during the fiscal year ending September 30, 2013, in order to obtain and retain Medicaid reimbursements.

89.   The submission of this false cost report misclassifying the donations as "other taxes" constituted a false claim under the FCA.

## Fiscal Year Ending September 30, 2014

90.     In the fiscal year ending September 30, 2014, defendant and other providers in Pinellas County donated a total of approximately $19,614,178 to the JWB pursuant to the non-bona-fide donation scheme. *See* Exhibit 2.

91.     Bayfront, after being acquired by HMA, donated approximately $293,322 to the JWB in November of 2013, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

92.     Bayfront, after being acquired by HMA, donated approximately $293,322 to the JWB in December of 2013, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

93.     Bayfront, after being acquired by HMA, donated approximately $293,322 to the JWB in January of 2014, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

94.     Bayfront, after being acquired by HMA, donated approximately $293,322 to the JWB in February of 2014, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

95.     Bayfront, after being acquired by HMA, donated approximately $293,322 to the JWB in March of 2014, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

96.   Bayfront, after being acquired by HMA, donated approximately $293,322 to the JWB in April of 2014, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

97.   Bayfront, after being acquired by HMA, donated approximately $293,322 to the JWB in May of 2014, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

98.   Bayfront, after being acquired by HMA, donated approximately $293,322 to the JWB in June of 2014, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

99.   Bayfront, after being acquired by HMA, donated approximately $293,322 to the JWB in July of 2014, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

100.   Bayfront, after being acquired by HMA, donated approximately $293,322 to the JWB in August of 2014, pursuant to the non-bona-fide donation scheme. *See* Exhibit 3.

101.   In the fiscal year ending September 30, 2014, JWB made a non-bona-fide IGT in the amount of approximately $17,652,760 to the Florida ACHA, retaining approximately 10% ($1,961,418) at the JWB. *See* Exhibit 2.

102.   Based upon the non-bona fide IGT of approximately $17,652,760, the United States made a matching payment called a Federal Medicaid Assistance

Percentage (FMAP) to the Florida ACHA in the amount of approximately $27,981,498. *See* Exhibit 2.

103. Bayfront thereafter falsely claimed an entitlement to Medicaid funding that included the FMAP payment made because of Bayfront's non-bona-fide donations.

104. The amount and rate at which Bayfront sought and received Medicaid reimbursement was inflated, fraudulently, as a result of Bayfront's non-bona-fide donations made during the fiscal year ending September 30, 2014.

105. Bayfront misrepresented the nature of its donations to JWB on its cost reports by classifying those donations as "other taxes," and claiming them as expenses. Federal regulations and guidelines do not allow providers to treat as expenses on cost reports "costs incurred by providers for gifts or donations." *See* Centers for Medicare and Medicaid Services ("CMS") "The Provider Reimbursement Manual" at § 2105.7.

106. As reflected on Exhibit 4 to this Amended Complaint, Bayfront fraudulently mis-classified the non-bona-fide donations made in the fiscal year ending September 30, 2014, as "Other Taxes."

107. Each cost report submitted contained the following certification and acknowledgement by Bayfront:

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN

THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

108.   In 2015, Bayfront submitted a cost report for a period covering the donations made to the JWB during the fiscal year ending September 30, 2014, in order to obtain and retain Medicaid reimbursements.

109.   The submission of this false cost report misclassifying the donations as "other taxes" constituted a false claim under the FCA.

**Fiscal Year Ending September 30, 2015**

110.   In the fiscal year ending September 30, 2015, defendant and other providers in Pinellas donated approximately $7,910,023 to the JWB pursuant to the non-bona-fide donation scheme.

111.   In the fiscal year ending September 30, 2015, defendant Bayfront used a different entity than JWB to effectuate the scheme, but participated in receipt of the illicitly obtained Medicaid reimbursements nonetheless. *See* Exhibit 2.

112.   In the fiscal year ending September 30, 2015, JWB made a non-bona-fide IGT in the amount of approximately $7,119,021 to the Florida ACHA, retaining approximately 10% ($791,002) at the JWB. *See* Exhibit 2.

113.   Based upon the non-bona-fide IGT of approximately $7,119,021, the United States made a matching payment called a Federal Medicaid Assistance

Percentage (FMAP) to the Florida ACHA in the amount of approximately $11,727,571. *See* Exhibit 2.

114.   Bayfront thereafter falsely claimed an entitlement to Medicaid funding that included the FMAP payment made because of Bayfront's non-bona-fide donations.

115.   The amount and rate at which Bayfront sought and received Medicaid reimbursement was inflated, fraudulently, as a result of Bayfront's non-bona-fide donations made during the fiscal year ending September 30, 2015.

116.   Bayfront misrepresented the nature of its donations to JWB on its cost reports by classifying those donations as "other taxes," and claiming them as expenses. Federal regulations and guidelines do not allow providers to treat as expenses on cost reports "costs incurred by providers for gifts or donations." *See* Centers for Medicare and Medicaid Services ("CMS") "The Provider Reimbursement Manual" at § 2105.7.

117.   As reflected on Exhibit 4 to this Amended Complaint, Bayfront fraudulently mis-classified the non-bona-fide donations made in the fiscal year ending September 30, 2015, as "Other Taxes."

118.   Each cost report submitted contained the following certification and acknowledgement by Bayfront:

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN

THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

119. In 2016, Bayfront submitted a cost report for a period covering the donations made to the JWB during the fiscal year ending September 30, 2015, in order to obtain and retain Medicaid reimbursements.

120. The submission of this false cost report misclassifying the donations as "other taxes" constituted a false claim under the FCA.

## VII.  SCIENTER

121. Scienter need not be pleaded with particularity; it is enough in a False Claims Act complaint to allege scienter generally. *See Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051, 1058 (11th Cir. 2015).

122. Bayfront falsely claimed an entitlement to Medicaid funding that included or was increased by virtue of the FMAP payment made because of Bayfront's non-bona-fide donations.

123. Bayfront knew or recklessly disregarded the fact that they were not permitted to obtain Medicaid reimbursements inflated by virtue of their non-bona-fide donations for fiscal years ending 2013-2015.

124. For example, Bayfront's parent corporation was involved in an unrelated case in New Mexico in which the government asserted that a very similar scheme, related to non-bona-fide donations, was illegal.

32

125.   In addition, Bayfront internally reserved for accounting purposes moneys obtained through the scheme described above, noting that such moneys were "IGT Dollars at Risk," in implicit recognition that the funds were obtained in a manner contrary to the law. *See* Exhibit 5 reflecting Bayfront's internal designation of IGT moneys as "Dollars at Risk" for the periods in fiscal years ending September 30, 2013 and September 30, 2014.

126.   Bayfront submitted falsified cost reports by including the non-bona fide donations within the category of allowable expenses, despite being aware that the donations were not "other taxes" but rather unallowable donations. *See* Exhibit 4.

127.   Similarly, CMS promulgated rules and opinions explaining that non-bona-fide donations could not be used to inflate Medicaid reimbursement amounts through FMAPs, and Bayfront was required to be familiar with CMS rules and regulations.

## VIII. MATERIALITY

128.   Bayfront's false claims were material because a reasonable person would ascribe importance to whether-or-not Bayfront's Medicaid reimbursements were inflated because it engaged in a fraudulent scheme utilizing non-bona-fide donations. Indeed, the Department of Justice itself stated the importance of exactly this type of fraud in announcing the settlement of claims brought in this very case against other co-defendants:

"Medicaid is a partnership between the federal government and state governments," said Principal Deputy Assistant Attorney General Brian M. Boynton, head of the Justice Department's Civil Division. "When the federal government provides Medicaid matching funds, there must be a corresponding expenditure by the state or a local unit of government. When private parties make unlawful, non-bona fide donations to state or local governments, they undermine a key safeguard for ensuring the integrity of the Medicaid program."

*See* Exhibit 4.

129.   In addition, and separately, Bayfront's false claims were material because Bayfront knew or had reason to know that the recipient of its representations (the United States and its Medicaid reimbursement agents and intermediaries) would attach importance to Bayfront's representations in determining its choice of action (specifically permitting Bayfront to receive and retain the fraudulently obtained Medicaid reimbursements), regardless of whether a reasonable person would do so. On February 2, 2015, the Department of Justice announced that Bayfront's parent and its hospitals "agreed to pay the United States $75 million to settle allegations that they violated the False Claims Act by making illegal donations to county governments which were used to fund the state share of Medicaid payments to the hospitals." *See* Exhibit 5. As a result, Bayfront had reason to know its conduct would be of importance to the government.

## FIRST CAUSE OF ACTION

Violations of the False Claims Act:
Presentation of False Statements Material to False Claims
31 U.S.C. § 3729(a)(1)(A) – Non-Bona-Fide Donation Scheme

130.   The foregoing paragraphs 1 through 129 are incorporated by reference as if fully set forth herein.

131.   The FCA imposes liability on any person who knowingly presents, or causes to be presented, to the United States for payment or approval any false or fraudulent claims for reimbursement. 31 U.S.C. § 3729(a)(1)(A).

132.   By virtue of the acts described above, defendant knowingly presented, and caused to be presented, false or fraudulent claims for payment or approval to the United States, including those specifically listed in Exhibit 1 and similar Medicaid reimbursement requests for other periods during the scheme as set forth in detail above, along with the fraudulent cost reports described in detail above.

133.   Defendant knowingly presented, and caused to be presented, false or fraudulent claims for Medicaid reimbursement that were inflated with federal matching funding payment made because of non-bona-fide donations.

134.   By virtue of the false or fraudulent claims that defendant presented and/or caused to be presented, the United States suffered damages in an amount to be determined at trial, trebled as per the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation. Additionally, Plaintiff-Relator

35

Mr. Bomar is entitled to share in any recovery obtained as per Section 3729 of the FCA. *Id*. § 3730.

## SECOND CAUSE OF ACTION

Violations of the False Claims Act:
Presentation of False Statements to get False Claims Paid
(31U.S.C. § 3729(a)(1)(B)) – Non-Bona-Fide Donation Scheme

135.    The foregoing paragraphs 1 through 129 are incorporated by reference as if set forth fully herein.

136.    The FCA imposes liability on any person who knowingly makes, uses or causes to be made or used false records or statements material to a false or fraudulent claim presented to the United States for payment or approval for reimbursement. 31 U.S.C. § 3729(a)(1)(B).

137.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records or statements to have false or fraudulent claims paid by the United States, including the records and statements submitted to obtain the reimbursements specifically listed in Exhibit 1 and similar Medicaid reimbursement requests for other periods during the scheme as set forth in detail above, along with the fraudulent cost reports described in detail above.

138.    Defendant knowingly made, used, or caused to be made or used false records or statements to get paid false or fraudulent claims for Medicaid reimbursement that were inflated with federal matching funding payment made

because of non-bona-fide donations.

139.    By virtue of the false or fraudulent claims that defendant made and/or caused to be made, the United States suffered damages in an amount to be determined at trial, trebled as per the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation. Additionally, Plaintiff-Relator Mr. Bomar is entitled to share in any recovery obtained as per Section 3729 of the FCA. *Id*. § 3730.

## **THIRD CAUSE OF ACTION**

Violations of the False Claims Act:
Conspiracy to Commit Violation of the FCA
(31 U.S.C. § 3729(a)(1)(C))

140.    The foregoing paragraphs 1-129 are incorporated by reference as if set forth fully herein.

141.    The FCA imposes liability on any person who conspires to violate the substantive FCA provisions. 31 U.S.C. § 3729(a)(l)(C).

142.    Defendant conspired to commit a violation of the FCA, namely violations of 31 U.S.C. § 3729(a)(l)(A) and (B) when they engaged in the scheme as described above, in conjunction with other providers (including Baycare, *see* Exhibit 6,) and JWB.

143.    By virtue of Bayfront's conspiracy to commit a violation of the FCA, the United States suffered damages in an amount to be determined at trial, trebled as per the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation. Additionally, Plaintiff-Relator Mr. Bomar is entitled

to share in any recovery obtained as per Section 3729 of the FCA. *Id*. § 3730.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator Mr. Bomar demands and prays that judgment be entered in his and the United States' favor against defendants as follows:

1)      As to the First Count under the FCA, for the amount of the United States' damages, trebled as required by law; such civil penalties as are required by law of not less than $5,500 and not more than $11,000; that plaintiff/relator be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA and all costs of this action including attorneys' fees and expenses; and that the United States and plaintiff/relator be granted all such other relief as the Court deems just and proper.

2)      As to the Second Count under the FCA, for the amount of the United States' damages, trebled as required by law; such civil penalties as are required by law of not less than $5,500 and not more than $11,000; that plaintiff/relator be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA and all costs of this action including attorneys' fees and expenses; and that the United States and plaintiff/relator be granted all such other relief as the Court deems just and proper.

3)      As to the Third Count under the FCA, for the amount of the United States' damages, trebled as required by law; such civil penalties as are required

by law of not less than $5,500 and not more than $11,000; that plaintiff/relator

be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA and

all costs of this action including attorneys' fees and expenses; and that the United

States and plaintiff/relator be granted all such other relief as the Court deems

just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff-Relator Mr. Bomar, on behalf of himself and the United States,

demands a jury trial in this case pursuant to Rule 38 of the Federal Rules of Civil

Procedure.


Dated: February 14, 2023          Respectfully submitted,


                                  */s/ Stephen S. Stallings*
                                  Stephen S. Stallings, Esquire
                                  FL ID No. 958859
                                  attorney@stevestallingslaw.com
                                  310 Grant Street, Suite 3600
                                  Pittsburgh, PA 15219
                                  T: 412.322.7777

                                  *Attorney for Plaintiff-Relator*
                                  *Mr. Larry Bomar*

## **CERTIFICATE OF SERVICE**

I, Stephen S. Stallings, Esq., hereby certify that on this the 14th day of February, 2023, a true and correct copy of the foregoing Amended Complaint, has been served via ECF on all counsel of record for all parties.s

*/s/ Stephen S. Stallings*
Stephen S. Stallings, Esquire